UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAM HUNT,

        Plaintiff,

  v.

MEDTRONIC USA, INC.,

        Defendant.

CASE NO. CV21-5854

ORDER

This matter is before the Court on defendant Medtronic's motions for summary judgment, Dkt. 81, and to exclude the opinions of Drs. Lindfors and Badger, Dkts. 83 and 85. Plaintiff William Hunt had a Medtronic spinal cord stimulator (SCS) implanted in his spine to help quell chronic pain. Hunt alleges that the SCS he received was different and inferior to the one Medtronic promoted to him and that Medtronic failed to adjust and eventually approve removal of the device. Hunt sued Medtronic, bringing claims for breach of contract, violation of the Consumer Protection Act (CPA), and negligence. The Court dismissed his breach of contract claim in 2022.[1] Medtronic moves for summary

---

[1] Dkt. 30 at 9.

ORDER - 1

judgment on his remaining CPA and negligence claims. Because Hunt cannot satisfy the "public impact" element for his CPA claim and lacks requisite expert testimony to establish breach and causation for his negligence claims, Medtronic's motion for summary judgment is granted, and the motions to exclude expert testimony are denied as moot.

## I. BACKGROUND

Hunt suffers from a condition called Ehlers-Danlos Syndrome which causes him significant joint pain. Dkt. 21, ¶ 5. In spring of 2017, a doctor at Electrical and Musculoskeletal Associates of Puget Sound (EMA) suggested that Hunt consider a Medtronic SCS. A SCS is implanted into a person's spine and delivers small electrical signals which inhibit pain signals to the brain, thereby reducing pain. *Id*.

EMA set up a meeting between Hunt and a Medtronic representative, Austin Kilpatrick, to discuss the SCS. *Id.* ¶¶ 10, 11. According to Hunt, Kilpatrick promoted, explained, and sold the SCS to him. *Id.* ¶ 11. Kilpatrick recommended that Hunt first undergo a trial procedure with the SCS where a neurostimulator would be attached externally before deciding whether to have a surgeon implant one in his spine. *Id.* ¶¶ 12, 13; Dkt. 93, Resp. at 2. Hunt agreed and underwent a trial procedure in September 2017. During the trial period, he met with Kilpatrick two to three times to adjust the stimulator. Dkt. 96-3, Hunt Dep. at 113:15-116:18, 124:8-11. Hunt allows that the trial period "went well," and that the external stimulator provided 50% to 70% pain relief. Dkt. 93 at 11–12; Dkt. 96-3, Hunt Dep at 116:15–19.

Hunt alleges that Kilpatrick made numerous misrepresentations about the SCS during this trial period. First, he says Kilpatrick told him he would have a tablet that he could use to adjust and reprogram the SCS on his own. Dkt. 21, ¶ 13. Second, he asserts that Kilpatrick told him that there were 28 settings for adjusting the SCS that would enable him to control where the impulses were sent, their intensity, and frequency with the tablet. *Id.*; Dkt. 21, ¶¶ 12–15. Finally, Kilpatrick assured Hunt that Medtronic doctors or personnel would be available to monitor and adjust the SCS function after implant. Dkt. 21, ¶ 22.

Hunt had a SCS surgically implanted in October 2017. Dkt. 21, ¶ 19. Instead of receiving the 97714 model Kilpatrick showed him during the trial period, Hunt received model 97715. *Id.* ¶¶ 18, 30, 31. One week after surgery, Medtronic representative Erin Offner activated the device. Hunt learned then that he would not get the tablet controller with 28 settings. Dkt. 96-3, Hunt Dep. at 152:16–153:15. Offner informed him that only Medtronic representatives and physicians can have the tablet, not patients. *Id*. Instead, Hunt received a remote controller with only three settings. *Id.* Hunt told Offner that the tablet was the reason that he got the SCS and that he did not want the implant without it. *Id*. at 168:16-169:6. Hunt continued to try and raise the lack of access to the tablet and 28 settings with Medtronic but was "essentially ignored." Dkt. 21, ¶ 32.

For the next two years Hunt had "varying success with the SCS, receiving some benefit but also dealing with other radicular issues." Dkt. 93, Resp. at 13. He does not specify what "other radicular issues" he suffered, but typically radicular pain "is a type of pain that radiates into the lower extremity directly along the course of a spinal nerve

ORDER - 3

root." *Radicular Pain and Radiculopathy Definition,* http://www.spine-health.com/glossary/r/radicular-pain-andradiculopathy. In any event, Medtronic representatives reprogramed his SCS "numerous times" in this period. Dkt. 96-3, Hunt Dep. at 165:6–14. In December 2017, he had the device's "adaptive stim[2]" turned off because it was repeatedly shocking him when he would sit or stand. Dkt. 21 ¶ 34. In April 2018, he asked Medtronic to remove the device. *Id.* ¶ 35. Medtronic refused, but turned the SCS off. *Id.* ¶¶ 36. At that same time, EMA was reducing his pain medications. *Id.* The combination left him in worse pain than he was before surgery, and "several days" after Medtronic turned off the SCS, Hunt had Medtronic representatives turn it back on. *Id.* He requested reprograming again in July 2018 and Kilpatrick reprogrammed it in August 2018. *Id.* ¶ 39.

By late 2018, Hunt ended his relationship with EMA because it wanted him to either agree to taper off pain medications or find a new pain management doctor. Dkt. 93 at 13; Dkt. 96-3, Hunt. Dep. 205:1–5; 206:12–24. His search for a new pain specialist was "unsuccessful," but he continued seeing Dr. Taggart with pain specialist Dr. Friedman as advisor. Dkt. 93 at 12; Dkt. 96-3, Hunt. Dep. 205:21-206:24.

In December 2019, Hunt got into a car accident during which he experienced a jolt up his spine to his skull. Dkt. 21, ¶ 45. After the accident, Medtronic representative Stephanie Peterson reprogrammed the SCS without the oversight of a Medtronic trained

---

[2] Hunt never defines "adaptive stim" and it is unclear whether it refers to the whole device or just a part of it.

ORDER - 4

physician. *Id.* ¶ 47. She did so even though there was concern that the SCS device leads had shifted during the accident. *Id.*

Hunt asserts that the SCS deteriorated over time. Dkt. 21, ¶ 52. By March 2021, the SCS "was sending shocks into [his] spine such that his body continually convulsed." *Id.* He requested various accommodations from Medtronic, including access to the tablet, daily calibrations, shutting down the device, and removal of the device. *Id.* ¶¶ 53, 54, 56, 57. Medtronic refused all of those requests. *Id.* On March 8, he texted Peterson asking to meet for assistance with the SCS, but she refused because she asserted he needed to be under the care of pain specialist to receive her assistance. Dkt. 96-2, Peterson Dep. 164: 11–15; 179:21-180:14. On March 11, Hunt went to the ER. Dkt. 96-3, Hunt Dep. 231:22–234:4. He tried to contact Peterson to come to the ER to help with the SCS. *Id.*; Dkt. 93 at 14. His ER doctor also called Peterson to seek help with the SCS. Dkt. 96-3, Hunt Decl. 231:22–232:1–10. Peterson did not go to the ER. Dkt. 96-2 Peterson 163:14-25. She told the ER doctor on the phone that Hunt needed to see a pain specialist if he needed to reprogram or manipulate the SCS beyond its remote-controlled settings. *Id.*; Dkt. 96-3, Hunt Dep. 231:22–232:1–10. Peterson asserts that the ER doctor on the phone did not ask her to come to the ER, and that after she relayed her recent correspondence with Hunt, the doctor agreed to let Hunt know that he needed to be seen by a pain specialist. Dkt. 96-2 Peterson 163:14-25, 164:20–25. Later that day, Hunt went to Dr. Taggart's office and asked Medtronic to meet him there, but no Medtronic representatives came. Dkt. 96-3, Hunt Dep. at 245:4–7.

Around the time[3] of his ER visit, Hunt made an incision to attempt to cut out the SCS himself, then after the ER visit, he hit the battery pack with a mallet until it stopped working. Dkt. 96-3, Hunt 262:6-23; Dkt. 96-14, Call Summary at 4; Dkt. 96-15, Med. Records 3/11/21 at 3. Ultimately, Hunt found an independent doctor who removed the SCS in June 2021. Dkt. 21 ¶ 57. No Medtronic representatives were present at the removal.

Hunt's complaint alleges Medtronic "engaged in unfair and/or deceptive practices" by misleading patients about access to the tablet and support from Medtronic personnel post-surgery, and that those practices "impact the public's interest" and violate Washington's Consumer Protection Act ("CPA"), RCW 19.86.010 *et seq*. Dkt. 21 ¶¶ 68–72., Hunt also alleges that Medtronic was negligent two ways: (1) it breached a duty of "reasonable care to provide accurate information" about the SCS by falsely telling him that he would get a tablet and post-surgery support; and (2) it breached a duty to service his SCS after his car accident. *Id.* ¶¶ 73–78. Hunt seeks actual or statutory damages, an injunction to prevent Medtronic from engaging in similar conduct in the future, general damages, medical and related expenses, and attorneys' fees and costs. *Id.* at 10.

Medtronic's summary judgment motion argues that Hunt's CPA claim fails as a matter of law because he fails to establish any of the five required elements. Dkt. 81 at 16. It argues he cannot satisfy that claim's "public impact" requirement because there is

---

[3] Hunt is unsure of the "exact time frame" he attempted an incision or struck the battery pack, but he believes it was after his ER visit. Dkt. 96-3, Hunt Dep. at 262:12–23. Medical notes that appear to be from the ER visit suggest that he already started the incision before coming to the ER. Dkt. 96-15 at 3.

no evidence that Medtronic has or is likely to repeat the misrepresentations he claims Kilpatrick made to him.

Medtronic argues Hunt's negligence claim fails because Medtronic representatives do not owe a duty to patients as a matter of law. It argues that even if it had a duty, there is no expert testimony supporting the conclusion that it breached that duty. Finally, Medtronic argues that Hunt's CPA and negligence claims both fail because even viewed in the light most favorable to Hunt, the evidence does demonstrate causation. It argues Hunt's experts "unequivocally opine that his ongoing physical injuries are the result of [the] motor vehicle accident" and that neither Hunt nor his experts connect Medtronic's acts or omission to his injuries. *Id*. at 7.

The arguments are addressed in turn.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether an issue of fact exists, the Court must *view all evidence in the light most favorable to the nonmoving party* and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

The moving party bears the initial burden of showing that there is no evidence that supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24. There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. at 248.

**B.    Hunt lacks evidence of a "public impact" for his CPA claim.**

Hunt alleges Medtronic violated the CPA by deceptively marketing the SCS device. Hunt must prove five elements to sustain his CPA claim: (1) an unfair or deceptive act or practice (2) occurring in trade or commerce (3) that impacts the public interest (4) causing an injury to the plaintiff's business or property with (5) a causal link between the unfair or deceptive act and the injury suffered. *Hangman Ridge Training Stables, Inc. v. Safeco Title* Ins. Co., 105 Wn.2d 778, 790 (1986). He argues that Medtronic's "deceitful misrepresentations," specifically the promise that patients will have a tablet that enables them to control 28 settings on the SCS and the promise that

Medtronic personnel would service the SCS post implant, "pervaded the flow of commerce through its prolific medical device sales in the state of Washington, jeopardizing the public interest and causing damage to [Hunt's] business and/or property." Dkt. 93 at 22. He clarifies that his CPA "damage" is distinct from his personal injuries that support his negligent servicing claim. For his CPA claim, he seeks "business/property damages for those costs incurred in purchasing a device that was misrepresented to him," including transportation costs to surgery and medical appointments. *Id*. at 29. In essence, he argues that because Medtronic misrepresented the SCS, "he did not get what he paid for and those monies spent in pursuit of the misrepresented device are damages to his property." *Id*.

      Medtronic argues that even if he can survive summary judgment on the other elements of his CPA claim, Hunt cannot show an impact on public interest (element 3) because there "is *no evidence* in the record that Mr. Kilpatrick's alleged comments reflect any systematic advertising campaign by Medtronic or that any other patient has the same expectation." *Id*. at 25. Because the Court agrees, it does not address the parties' arguments on the remaining elements.

      Hunt responds that he "does not have to prove that every member of the public or every Medtronic patient was victim to Defendant's deceit and misrepresentations, but only that Plaintiff himself fell victim to Medtronic's misrepresentations and that Medtronic's presence in trade exposes other patients to the same." Dkt. 93 at 26. He argues that it is a "reasonable inference" from his allegations that Medtronic representatives are "trained to make such misrepresentations" and "regularly" do so. *Id*.

ORDER - 9

The CPA's purpose is to "protect the public." RCW 19.86.920. "[I]t is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest." *Hangman Ridge,* 105 Wn.2d at 790. Courts consider four factors in determining whether an act impacts the public:

> (1) whether the alleged acts were committed in the course of defendant's business; (2) whether the defendant advertised to the public in general; (3) whether the defendant actively solicited this particular plaintiff, indicating potential solicitation of others; (4) whether the plaintiff and defendant have unequal bargaining positions.

*Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 605, (2009) (citing *Hangman Ridge*, 105 Wn.2d at 790). Where there is no evidence in the record to support "a real and substantial potential for repetition," as opposed to a mere hypothetical possibility of an isolated deceptive act being repeated, a grant of summary judgment is appropriate. *See, e.g., Nat'l Prods. v. Gamber-Johnson LLC*, 699 F. Supp. 2d 1232, 1242 (W.D. Wash. 2010); *Mosquera-Lacy*, 165 Wn.2d at 605.

The Court previously addressed the parties' CPA arguments in its Order granting in part Medtronic's motion to dismiss, Dkt. 30 at 10–12. It determined that Hunt met the low bar for plausibly pleading a CPA claim. *Id*. at 12. But Hunt's burden under Rule 12(b)(6) is substantially lower than to the one he must meet to survive a summary judgment motion. To survive a motion to dismiss, Hunt needed only to provide factual allegations that are "enough to raise a right to relief above the speculative level" when the court assumes their truth. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Based on that standard, the Court determined that Hunt satisfied the public impact requirement for

a CPA claim. It assumed the truth of Hunt's "somewhat conclusory" allegation that "Medtronic's acts were part of a pattern of conduct," and concluded that there was "certainly potential for repetition" of the alleged misrepresentations because they "occurred in the course of Medtronic's business and Medtronic representatives have access to patients receiving the SCS." Dkt. 30 at 12. The Order acknowledged that "this was a private consumer transaction that only directly affected Hunt himself and it is unclear whether any of the alleged other acts took place prior to Hunt's personal allegations in this case," but it nevertheless concluded that there was enough in the complaint for a plausible CPA claim. *Id*.

On summary judgment, Hunt carries the burden of producing evidence that, viewed in the light most favorable to him, demonstrates a jury could find for him on each element of his CPA claim. *Anderson*, 477 U.S. at 248. He has not carried this burden. Hunt is of course correct that he need not "prove that every member of the public or every Medtronic patient was victim to Defendant's deceit" (Dkt.93 at 26), but he does need evidence that *any* person other than himself suffered the same deceit, or that Medtronic is likely to make the same misrepresentations to someone else. Hunt asks the Court to infer that because Medtronic's representatives misrepresented SCS features to him, it follows that they did so to others. He argues that "Medtronic representatives are trained to make such misrepresentations" and that they "regularly" do so, but he provides no evidence to support that allegation. Dkt. 93 at 26. Furthermore, Hunt offers no evidence that Medtronic solicited him specifically, or that they advertise directly to the public at large.

ORDER - 11

1    Medtronic provides unrebutted evidence that it has never allowed patients to own
2    or use the tablet alone, and that FDA restrictions would not permit it to do so. The FDA
3    approved the SCS and tablet in its regulatory review process, premarket approval or
4    "PMA" process. Dkt. 81 at 7. In that process, it determined that the tablet is a
5    "prescription device" and consequently prohibits Medtronic to provide it directly to
6    patients. *Id*. Kilpatrick demonstrated that he understood that he cannot give tablets to
7    patients in his deposition: "Q: So under the FDA approval process for the system, can
8    Medtronic hand out tablets to patients? A: No." Dkt. 82-3 at 168:25-170:10.[4] This
9    renders Hunt's proposed inference that Medtronic regularly assures patients that they will
10   receive the tablet unreasonable. The SCS has been around for decades. There is no
11   evidence, and no reasonable inference that Medtronic's alleged deception of Hunt was
12   repeated to other patients.  If Medtronic regularly tells patients that they would get a
13   tablet and they never do, Hunt would likely have company as a plaintiff. Even viewed in
14   the light most favorable to him, Hunt has failed to provide any evidence that would
15   permit a jury to conclude that Kilpatrick's representations to him have a public impact.
16   Medtronic's motion for summary judgment on Hunt's CPA claim is **GRANTED** and the
17   claim is **dismissed with prejudice**.

---

[4] Medtronic quotes Dkt. 82-3, "Wittlake Decl., Ex. C**,** Kilpatrick Dep., at 168:25-170:10" but that docket entry is missing page 168 of Kilpatrick's deposition.

**C.    Hunt lacks expert testimony to establish breach and causation for his negligence claims.**

Hunt alleges that Medtronic representatives were negligent in two ways. First, he argues Medtronic had a duty to provide "reasonable care" to Hunt, and asserts that when "a medical device company voluntarily provides technical information to a patient about a medical device, it may have a legal duty to do so in a reasonable and prudent manner." Dkt. 93 at 19. He argues Kilpatrick breached this duty when he misled Hunt about critical components of the Medtronic SCS device, specifically "the model of the device that would be surgically implanted in his body (model 97715 vs model 97714), the features available on the implanted device model (tablet with 28 customization options vs remote with three modes), and the promise to provide service to the device." *Id*. at 19–20. He argues this breach caused him injury because but for Kilpatrick's misrepresentations, he "would not have agreed to implant the device and incur the associated costs." *Id*. at 21.

Second, Hunt argues Medtronic owed him a duty to service the SCS, and alleges that Peterson breached this duty twice. Once on March 8, 2021, when she refused his request to recalibrate the SCS, and again on March 11, when she refused to come to the ER to assist with the device despite requests from Hunt and an ER doctor. Dkt. 93 at 20–21. Hunt argues he was "undeniably damaged by Medtronic's breach of its duty to service the malfunctioning SCS, ultimately prompting [him] to cut the device out of his body in desperation to stop the unbearable unprompted shocks." *Id*. at 21.

Medtronic argues that Hunt's negligence claim fails for three reasons. First, it argues he cannot establish that its representatives owe him a duty because a

ORDER - 13

representative merely "provides technical support at the request of a physician" and does not owe any duty of care to a patient. Dkt. 81 at 15. Second, even if representatives owe a duty to patients, Medtronic argues the scope of that duty is not within the knowledge of the average lay person. Consequently, it argues Hunt needs expert testimony to establish the breach, but his experts do not offer any such opinions. *Id.*

Third, Medtronic argues Hunt has not established causation because there is "no evidence or testimony that connects his alleged damages with the alleged negligence of Ms. Peterson." *Id.* It emphasizes that medical causation must be established by the testimony of a qualified expert witness, and argues that Hunt's experts do not offer any opinion that Kilpatrick's or Peterson's alleged negligence caused his damages. *Id.* at 21. When Dr. Lindfors was asked in his deposition, "you don't have any criticisms of Medtronic's device representatives?" he responded with a flat "No." Dkt. 82-9 at 62:24–63:1. Dr. Badger was similarly definitive on this point in his deposition: "Q: So is it fair to assume you're not planning to come to court and offer any criticisms of the Medtronic representatives? A. Correct." Dkt. 82-10 at 25:9-12. Dr. Lindfors abstained from opining about the causation of Hunt's injuries altogether and instead focused on the fact that the SCS leads migrated after the auto accident. Dkt. 82-9, Lindfors Dep. at 25:17–20; 62:16–20. Dr. Badger opined further that the crashed caused the leads to migrate. Dkt. 82-10, Badger Dep. at 72:1-2.

To establish a claim for negligence, Hunt must prove that (1) Medtronic owed him a duty, (2) that it breached that duty, (3) a resulting injury, and (4) that the breach proximately caused the injury. *Johnson v. Wash. State Liquor & Cannabis Bd.*, 197

ORDER - 14

Wn.2d 605, 611 (2021). A plaintiff must provide expert testimony if an element "is best established by an opinion which is beyond the expertise of a layperson." *Harris v. Robert C. Groth, M.D., P.S.*, 99 Wn. 2d 438, 448 (1983). For medical causation in particular, experts are necessary "where the nature of the injury involves 'obscure medical facts which are beyond an ordinary lay person's knowledge." *Erickson v. Pharmacia LLC*, 31 Wn. App. 2d 100, 166 (2024) (citation omitted).

Even if the Court were to admit all the expert testimony that Hunt proposes, he still lacks expert opinions necessary to establish both the breach and causation elements of his negligence claims. The scope of any duty that Medtronic representatives owe to patients who are considering an SCS implant, and to those who have one implanted, requires understanding of medical devices and services that falls beyond the common knowledge of a layperson. Consequently, Hunt needs expert opinions to establish breach of that duty. *Harris*, 99 Wn.2d at 448. Although there does not appear to be Washington precedent that addresses the need for expert testimony in the context of medical device marketing, at least one court in Texas explained the logic in requiring plaintiffs to provide such expert testimony in *Ethicon Endo-Surgery, Inc. v. Gillies*, 343 S.W.3d 205 (Tex. App. 2011). The court there addressed negligent marketing claim for a medical staple machine used in gastric bypass surgery. It reasoned,

> When the conduct at issue involves the use of specialized equipment and techniques, expert testimony must establish both the standard of care and a violation of that standard…Because we conclude the standard of care in marketing a specialized medical device requiring specialized technique for use is not within the experience of laymen, we must also conclude expert testimony was required to prove negligent marketing of such a device in this case.

Case 3:21-cv-05854-BHS   Document 112   Filed 01/31/25   Page 16 of 17

*Id.* at 211–212 (internal citations omitted). This logic serves here. Because expert testimony is necessary to explain how the SCS works, expert testimony is necessary to sustain a claim for negligent marketing and certainly for negligent servicing of the SCS. Furthermore, Hunt's failure to address Medtronic's argument that he needs expert testimony to establish breach concedes its validity. *See Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (plaintiff abandoned claims by not raising them in opposition to a motion for summary judgment); *In re Online DVD Rental Antitrust Litig.*, 2011 WL 5883772, at *12 (N.D. Cal. Nov. 23, 2011) (absent unusual circumstances, failure to respond to argument on merits "viewed as grounds for waiver or concession of the argument"). Hunt even uses tentative language when describing the scope of Medtronic representatives' duty in advertising the SCS: "[if] a medical device company voluntarily provides technical information to a patient about a medical device, it *may* have a legal duty to do so in a reasonable and prudent manner." Dkt. 93 at 19 (emphasis added).

Hunt similarly lacks expert testimony needed to establish that Medtronic's failure to service his SCS proximately caused his injuries. His physical injuries undoubtedly involve "obscure medical facts which are beyond an ordinary lay person's knowledge," consequently he needs expert medical testimony to establish causation. *Erickson*, 548 P.3d at 264. Hunt's experts are explicit that they have no opinion that representative Peterson's actions or inactions caused Hunt injury. To the contrary, his experts opine that the car crash caused the leads in the SCS to migrate and that this likely caused or contributed to his increased pain in March. Dkt. 82-9, Lindfors Dep. at 62:18–20 ("the

only thing I would comment on if I went to trial is the position of the leads on the two X-rays"); Dkt. 82-19, Badger Dep at 72:1–2 ("I believe his causation would be the motor vehicle accident."). In any event, without expert testimony to establish that "but for" Peterson's actions Hunt would not be injured, his claim that Medtronic was negligent in failing to service his SCS fails as a matter of law. *Schooley*, 134 Wn.2d at 478. Because he lacks expert testimony needed to establish both breach and causation, Medtronic's motion for summary judgment on his negligence claim is **GRANTED**, and the negligence claim is **dismissed with prejudice**.

### III.  ORDER

Therefore, it is hereby **ORDERED** that Medtronic's motion for summary judgment, Dkt. 81, is **GRANTED**. Because both of Hunt's remaining claims are dismissed with prejudice, Medtronic's motions to exclude the opinions of Dr. Lindfors, Dkt. 83, Dr. Badger, Dkt. 85 are **DENIED** as moot.

Dated this 31st day of January, 2025.

BENJAMIN H. SETTLE
United States District Judge